UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA　　　　　　: Criminal No.:10

    v.　　　　　　　　　　　　　　　　: Filed:

    　　　　　　　　　　　　　　　　　: Violations:　15 U.S.C. § 1
　　　　　　　　　　　　　　　　　　　　　　　　　　18 U.S.C. § 371
MARK ZAINO,　　　　　　　　　　　:　　　　　18 U.S.C. § 1343
　　　　　　　　　　　　　　　　　　　　　　　　　　18 U.S.C. § 2

    Defendant.　　　　**10 CRIM 434**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x



## INFORMATION

The United States of America, acting through its attorneys, charges:

### COUNT ONE -- CONSPIRACY TO RESTRAIN TRADE
(15 U.S.C. § 1)

1.　　MARK ZAINO is hereby made a defendant on the charge stated below.

### I. THE RELEVANT PARTIES AND ENTITIES

During the period covered by this Count:

2.　　Defendant ZAINO was employed by a financial services company, located

in New York, New York, that was registered as a broker-dealer and investment adviser

with the United States Securities and Exchange Commission ("SEC"). This financial

services company was a wholly-owned subsidiary of Financial Institution A.

3.　　Defendant ZAINO worked for the financial services company from

approximately March 2001 until late 2006, first as a Senior Analyst, then as an Associate

Vice President and Assistant Vice President, and finally as a Director. Defendant ZAINO worked on the municipal bond and derivatives ("MRD") desk for the financial services company and his compensation, including bonus, was based on, among other things, the amount of fees and revenue generated by the MRD desk.

4.      Financial Institution A was a financial institution that was an organization operating under Section 25 or 25(a) of the Federal Reserve Act, and a branch or agency of a foreign bank, within the meaning of Title18, United States Code, Section 20.

5.      Directly or through its subsidiaries, Financial Institution A marketed financial products and services to various municipalities throughout the United States, including services as a broker for investment agreements and other municipal finance contracts, as described in Paragraphs 9 through 17 of this Count. Financial Institution A also provided underwriting and investment services to various municipalities throughout the United States, including investment agreements for the proceeds of municipal bonds.

6.      For the purposes of this Count, Financial Institution A was acting in its capacity as a broker for investment agreements and other municipal finance contracts.

7.      Whenever in this Count reference is made to any act, deed, or transaction of any corporation, such allegation shall be deemed to mean that the corporation engaged in such act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

2

8.     Various other persons and firms, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof, including Financial Institution A.

## II. BACKGROUND

9.     Municipal bonds are issued by government entities, such as states, counties, and cities, or quasi-governmental entities, such as public authorities and school, utility or water districts, to raise money for operating funds or for specific projects, such as the construction of public facilities, and to refinance outstanding municipal debt.  In some instances, the entity issuing the bond turns the money over to a not-for-profit entity, such as a school or hospital, or an entity that will spend the money for a specific public purpose, such as the construction of low-cost housing or waste treatment facilities.  Both the entities that issue municipal bonds and the entities that receive and spend the money are, unless otherwise stated, collectively referred to herein as "issuers," "municipal issuers," or "municipalities."  In 2007 and 2008, combined, approximately $800 billion in municipal bonds were issued in the United States.

10.     The money an issuer raises from a municipal bond offering ("bond proceeds") is typically spent over a period of time rather than immediately, in one lump sum.  The issuer frequently invests some or all bond proceeds in an investment product (sometimes referred to as an "investment agreement"), which is designed for its specific needs.  Investment agreements vary in size from a few hundred thousand to several

hundred million dollars and in duration from as short as one month to as long as forty years.

11.     Major financial institutions, including banks, investment banks, insurance companies, and financial services companies (collectively "providers") sell investment agreements through their employees or agents ("marketers").

12.     Issuers usually select providers of investment agreements through bona fide competitive bidding procedures that are designed to comply with federal tax law and United States Department of the Treasury regulations relating to the tax-exempt status of municipal bonds. Compliance with these regulations is monitored by the Internal Revenue Service ("IRS"), which is entitled to receive a portion of the earnings from a municipality's investment agreement under certain circumstances. Among other things, each provider submitting a bid typically certifies that specific Treasury regulations have been followed, including that the provider did not consult with any other potential provider about its bid and that all providers had an equal opportunity to bid, commonly referred to as the no "last looks" provision.

13.     Issuers often hire third parties ("brokers") to act as their agents in conducting a bona fide competitive bidding process and complying with the relevant Treasury regulations. The broker's fee for conducting a bona fide competitive bidding process is generally paid by the winning provider, which takes account of the cost of such broker's fee when calculating its bid and generally discloses the fee to the issuer.

4

14.     Brokers offer a variety of services, including offering suggestions about the availability and suitability of investment products, drafting bid specifications, and identifying the most competitive, qualified providers to be solicited as bidders.  In some cases, the broker decides which providers will be solicited to bid without consulting with the issuer or any of the other professional representatives advising the issuer.

15.     Brokers are usually responsible for distributing the bid packages (specifications and bid forms) to providers selected to receive them, usually via e-mail; keeping in touch with the potential bidders to answer questions about the bid specifications; and conducting the bidding process, which typically involves receiving the providers' bids by telephone at a time identified in the bid specifications, followed by a confirming copy of the bid via facsimile.  After reviewing the bids to ensure conformity with the specifications, brokers then inform the issuer of the outcome of the bid, including the identity of the winning, qualified bidder and, if appropriate, any conditions that deviate from the specifications.  Brokers are often required by the issuer to  provide written certification that the bidding procedures complied with the relevant Treasury regulations.

16.     Depending on the structure of the bid, providers may be asked to quote only the interest rate to be paid on funds on deposit for the duration of the agreement or they may be asked to submit a bid in the form of a dollar amount or date (sometimes referred to as the "price" or "price level" of a bid).  In a typical investment agreement, providers are asked to quote only an interest rate and, generally, the agreement is awarded to the

5

provider quoting the highest rate.

17.     Many brokers that conduct <u>bona</u> <u>fide</u> competitive bidding for investment agreements subject to the Treasury regulations are also hired by municipalities and other quasi-governmental entities to conduct <u>bona</u> <u>fide</u> competitive bidding in connection with the award of other contracts involving public funds, even though those contracts are not subject to the Treasury regulations.  These contracts (collectively, "other municipal finance contracts") include investment agreements for taxable municipal bonds; investment agreements for funds borrowed by entities in which the federal government or any municipal entity is a participant; and derivative contracts, which are contracts between a municipal issuer and a financial institution that are designed to manage or transfer some or all of the interest rate risk associated with a municipal bond issue.  They do not include underwriting contracts.

### III. <u>DESCRIPTION OF THE OFFENSE</u>

18.     From at least as early as October 2001 until March 2006, the exact dates being unknown to the United States, defendant ZAINO and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

19.     The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among defendant ZAINO and co-conspirators, the substantial terms of which were to allocate and rig bids for investment agreements or other

municipal finance contracts.

## IV. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

20.     For the purpose of forming and effectuating the aforesaid combination and conspiracy, defendant ZAINO and co-conspirators did those things which they combined and conspired to do, including, among other things:

(a)     designating in advance of the submission of bids which provider among the co-conspirator providers would be the winning bidder for certain investment agreements or other municipal finance contracts;

(b)     discussing and agreeing on the prices or price levels co-conspirator providers would bid for certain investment agreements or other municipal finance contracts being brokered by Financial Institution A;

(c)     causing providers to submit to Financial Institution A intentionally losing bids for certain investment agreements or other municipal finance contracts with the understanding that co-conspirator providers submitting the intentionally losing bids would be allocated other investment agreements or other municipal finance contracts. The intentionally losing bids made it appear both to the municipalities that hired Financial Institution A as a broker and, where appropriate, to the IRS that the winning co-conspirator provider had submitted a bona fide competitive bid for those agreements and contracts, when, in fact, it had not;

(d)     falsely certifying and forwarding false certifications that the bidding

7

for certain investment agreements or other municipal finance contracts was in compliance with the relevant Treasury regulations or was otherwise competitive;

       (e)    discussing and agreeing that certain providers would pay Financial Institution A kickbacks disguised in the form of inflated or unearned fees. These kickbacks were in exchange for Financial Institution A's assistance in controlling the bidding process and for ensuring that co-conspirator providers won the bids they were allocated; and

       (f)    paying municipalities or causing municipalities to be paid artificially determined or suppressed yields for the duration of certain investment agreements or other municipal finance contracts, thereby increasing the profitability of those agreements or contracts for the winning co-conspirator provider for the duration of such contracts.

## V. INTERSTATE TRADE AND COMMERCE

21.    From at least as early as October 2001 until at least March 2006, pursuant to the investment agreements and other municipal finance contracts that are the subject of this Count, defendant ZAINO and co-conspirators caused substantial amounts of money to be transferred between co-conspirator providers and municipal issuers and other government or quasi-government entities throughout the United States.

22.    The activities of defendant ZAINO and co-conspirators with respect to the aforementioned investment agreements and other municipal finance contracts were within the flow of, and substantially affected, interstate trade and commerce.

## VI.  JURISDICTION AND VENUE

23.     The aforesaid combination and conspiracy was formed and carried out, in part, within the Southern District of New York within the five years preceding the filing of this Information.

IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1

### COUNT TWO -- CONSPIRACY
(18 U.S.C. § 371)

The United States of America further charges:

24.     MARK ZAINO is hereby made a defendant on the charge stated below.

25.     Paragraphs 2 through 4 and 9 through 17 of Count One of this Information are repeated,  realleged, and incorporated in Count Two as if fully set forth in this Count.

26.      Rubin/Chambers, Dunhill Insurance Services, Inc. ("CDR"), located in Beverly Hills, California, was a financial services company that acted as a broker for investment agreements and other municipal finance contracts for municipal issuers throughout the United States.

27.     Provider A was a group of related financial services companies located in New York, New York and owned or controlled by a company headquartered in New York, New York.  Marketer A was a representative of Provider A.

28.     Directly or through its subsidiaries, Financial Institution A was a provider of investment agreements and other municipal finance contracts and participated in the competitive bidding process in order to obtain those agreements and contracts.  In addition,

Financial Institution A was also a provider of derivative contracts, such as swaps, to municipal issuers and to other financial institutions, including other providers of investment agreements and municipal finance contracts.

29.     Various other persons and entities, not made defendants herein, participated as co-conspirators in the offense charged herein and performed acts in furtherance thereof. They included CDR and certain employees of CDR, Provider A, Marketer A, and Financial Institution A.

## VII.   DESCRIPTION OF THE OFFENSE

30.     From at least as early as August 2001 until March 2006, the exact dates being unknown to the United States, in the Southern District of New York and elsewhere, defendant ZAINO and co-conspirators unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Sections 1343 and 1005, and to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of the Treasury, all in violation of Title 18, United States Code, Section 371.

31.     It was a part and an object of the conspiracy that defendant ZAINO and co-conspirators, unlawfully, willfully and knowingly, would and did devise and intend to devise a scheme and artifice to defraud municipalities and to obtain money and property from municipalities by means of false and fraudulent pretenses, representations, and

promises, namely, a scheme to deprive municipalities of money by facilitating Provider A's

payment of kickbacks to CDR through the execution of swap transactions, and by

submitting intentionally losing bids to CDR, and for the purpose of executing such scheme

and artifice, and attempting to do so, defendant ZAINO and co-conspirators would and did

transmit and cause to be transmitted by means of wire, radio or television communication in

interstate or foreign commerce any writings, signs, signals, pictures or sounds, in violation

of Title 18, United States Code, Section 1343.

32.   It was further a part and an object of the conspiracy that defendant ZAINO

and co-conspirators would and did defraud the United States and the IRS by impeding,

impairing, obstructing, and defeating the lawful government functions of the IRS in the

ascertainment, computation, assessment, and collection of revenue due and owing from

municipal issuers and in exercising its responsibilities to monitor compliance with Treasury

regulations related to tax-exempt municipal bonds, in violation of Title 18, United States

Code, Section 371.

33.   It was further a part and an object of the conspiracy that defendant ZAINO

and co-conspirators, with intent to defraud the United States or any agency thereof, to wit,

the United States Department of the Treasury and the IRS, pursuant to the scheme

identified in this Count, would and did participate and share in and receive (directly and

indirectly) money, profit, property, and benefits, to wit, one or more kickbacks identified in

this Count, through transactions, commissions, contracts and any other acts of a financial

institution, to wit, Financial Institution A; namely, through Financial Institution A,

defendant ZAINO would and did facilitate Provider A's payment of kickbacks to CDR

through the execution of swap transactions, in violation of Title 18, United States Code,

Section 1005.

## VIII. THE MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

The manner and means by which the conspiracy was sought to be accomplished

included, among others, the following:

34.     Defendant ZAINO and co-conspirators engaged in an ongoing scheme to

defraud municipalities and the IRS by causing municipal issuers to enter into investment

agreements and other municipal finance contracts with Provider A at artificially determined

or suppressed price levels through the control and manipulation of the bidding for those

agreements and contracts.  In exchange, co-conspirators at CDR asked that Provider A pay

kickbacks to CDR.  Provider A agreed and arranged to pay kickbacks to CDR in the

following manner: the kickbacks were disguised as fees ("hedge fees") that purported to

compensate CDR for acting as a broker in arranging financial transactions known as swaps

between Provider A and financial institutions, including Financial Institution A, but those

fees were, in fact, unearned or inflated.  The rates of Provider A's swaps with Financial

Institution A were adjusted to include the hedge fees Provider A wanted to pay CDR, and

Financial Institution A then paid to CDR the kickbacks disguised as hedge fees.  Neither

CDR nor Provider A disclosed to issuers that Provider A had agreed to pay CDR hedge fees

in connection with the award and execution of investment agreements or other municipal finance contracts. In some cases, these kickbacks reduced the amount of money the municipalities received and continue to receive pursuant to investment agreements or other municipal finance contracts awarded to Provider A.

35. The conspirators attempted to increase the number and profitability of investment agreements and other municipal finance contracts awarded by CDR to Provider A by controlling which other providers were solicited for bids and securing the agreement of other providers to submit intentionally losing bids, where possible, including bids submitted by defendant ZAINO on behalf of Financial Institution A, and by arranging for Marketer A to submit Provider A's bid last. Before Marketer A actually decided what price to bid, the CDR co-conspirators received and reviewed bids from other providers and gave Marketer A information about the prices, price levels or conditions of those bids, including, on occasion, the specific amounts other providers had bid. Marketer A then used that information to determine Provider A's bid. On some occasions, co-conspirators at CDR told Marketer A that he could lower Provider A's bid and still win the contracts and, further, suggested the exact amount by or to which the bid could be reduced. Marketer A followed these suggestions. As a result of information co-conspirators at CDR gave Marketer A about bids from other providers, Provider A was awarded and has performed and is scheduled to continue to perform investment agreements and other municipal finance contracts at artificially determined levels that deprived and will continue to deprive municipalities of

13

money.

36.     By secretly controlling and manipulating the bidding for investment agreements and other municipal finance contracts, defendant ZAINO and co-conspirators caused municipalities not to file required reports or to file inaccurate reports with the IRS, and to fail to give the IRS or the Treasury money to which it was entitled, thus also jeopardizing the tax-exempt status of the underlying bonds.

## IX.  OVERT ACTS

37.     In furtherance of the conspiracy and to effect the illegal objects thereof, defendant ZAINO and co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

(a)     On numerous occasions, at or about the time the bid specifications stated that bids were due, co-conspirators at CDR participated in interstate telephone calls between California and New York, New York during which they gave Marketer A information about the prices, price levels, or conditions of bids from other providers and Marketer A then used that information to determine Provider A's bid.

(b)     On numerous occasions, prior to taking bids for certain investment agreements or other municipal finance contracts, co-conspirators at CDR participated in interstate telephone calls between California and New York, New York with Marketer A and other co-conspirators, including defendant ZAINO, during which they made or sought to make arrangements for CDR to receive kickbacks in the form of purported hedge fees that

14

were not disclosed to the municipality.

(c)     On numerous occasions, co-conspirators at CDR falsely certified or caused to be certified that the bidding process complied with relevant Treasury regulations, or was otherwise competitive, and forwarded bids and certifications from Marketer A or Provider A and other co-conspirator providers, containing corresponding false representations.

(d)     On numerous occasions, Provider A paid via wire transfer and is scheduled to continue to pay municipalities interest on money it received pursuant to investment agreements or other municipal finance contracts whose rates were artificially determined or suppressed.

(e)     On numerous occasions, Financial Institution A paid CDR kickbacks on behalf of Provider A via wire transfer.

(f)     With respect to the award and performance of an investment agreement with a state health and educational facilities authority, defendant ZAINO and co-conspirators committed the following overt acts, among others:

(i)     on or about August 12, 2002, during an interstate telephone conversation between New York, New York and California, a co-conspirator at CDR and defendant ZAINO discussed with Marketer A the details of an upcoming bid for an investment agreement and a swap between Provider A and Financial Institution A, including the amount Provider A would bid for the investment agreement, the rate on the swap, and

the amount of the kickback to be paid to CDR in the form of a hedge fee;

(ii)    on or about August 16, 2002, during interstate telephone conversations between New York, New York and California, co-conspirators at CDR and defendant ZAINO agreed with Marketer A on the bid Provider A would submit to win the investment agreement, the rate on the swap between Financial Institution A and Provider A, and the amount of the kickback to be paid to CDR in the form of a hedge fee;

(iii)    on or about August 20, 2002, via international wire transfer from London, England to Los Angeles, California, defendant ZAINO caused Financial Institution A to pay CDR a $475,000 kickback in the form of a hedge fee on behalf of Provider A; and

(iv)    beginning approximately December 1, 2002 and continuing until at least March 2006, Provider A made and continues to make semi-annual interest payments on the investment agreement at a rate that was artificially suppressed, including a $482,108.82 interest payment from Provider A to the state health and educational facilities authority on or about November 30, 2005, via interstate wire transfer from New York, New York to Kansas City, Missouri.

(g)    With respect to two investment agreements with a municipal public works authority, including one for which the bids were due June 27, 2002, and a second for which the bids, in the form of an up-front payment, were due on June 28, 2002, defendant ZAINO and co-conspirators committed the following overt acts, among others:

(i)    on or about June 27, 2002, during a telephone conversation on

16

the day the bids for the first investment agreement were due but prior to the bids being submitted, Marketer A spoke to defendant ZAINO and asked whether ZAINO had received information about an investment agreement being brokered by CDR.  Marketer A and ZAINO then discussed the terms of a swap between Financial Institution A and Provider A that would be executed after Provider A was awarded the first investment agreement. Marketer A told ZAINO that a co-conspirator at CDR would call him when CDR needed "something" from ZAINO;

     (ii) on or about June 27, 2002, on the day the bids for the first investment agreement were due but prior to bids being submitted, during an interstate telephone conversation between California and New York, New York, co-conspirators at CDR and Marketer A discussed the price Marketer A intended to bid for the first investment agreement.  Marketer A said what price he would bid and then he and the co-conspirators at CDR discussed a swap transaction that Provider A and Financial Institution A would execute after Provider A was awarded the investment agreement.  Co-conspirators at CDR and Marketer A then discussed and agreed on the amount of a kickback CDR would receive in the form of a hedge fee, and confirmed that Marketer A was arranging a swap transaction with defendant ZAINO;

     (iii) on or about June 27, 2002, during a telephone call prior to the bids for the first investment agreement being submitted, Marketer A and defendant ZAINO discussed the terms of the swap transaction that Provider A and Financial Institution A

would execute after Provider A was awarded that investment agreement;

        (iv)    on or about June 27, 2002, during a telephone call prior to the bids for the first investment agreement being submitted, defendant ZAINO and Marketer A finalized the terms of the swap between Provider A and Financial Institution A.  ZAINO confirmed with Marketer A that he needed "to bake in something" for CDR;

        (v)    on or about June 27, 2002, during an interstate telephone conversation between California and New York, New York, Marketer A left a co-conspirator at CDR a voice mail message informing the co-conspirator that Marketer A had finalized with defendant ZAINO the terms of the swap between Provider A and Financial Institution A and that Marketer A had arranged to pay CDR a kickback in the form of a hedge fee;

        (vi)    on or about June 27, 2002, via wire transfer, defendant ZAINO caused Financial Institution A to pay CDR a $32,600 kickback in the form of a hedge fee on behalf of Provider A;

        (vii)    on or about June 28, 2002, during an interstate telephone conversation between California and New York, New York that occurred approximately 45 minutes before the final bids were due for the second investment agreement, a co-conspirator from CDR asked Marketer A for an "indication" regarding the amount Provider A would bid for that agreement;

        (viii)   on or about June 28, 2002, during an interstate telephone

18

conversation between California and New York, New York that occurred approximately two minutes before the final bids were due for the second investment agreement, a co-conspirator at CDR and Marketer A discussed and agreed what amount Provider A would bid, and also discussed and agreed on an additional kickback that Provider A would pay to CDR in the form of a hedge fee;

(ix)    on or about June 28, 2002, via a facsimile transmission from New York, New York to California, defendant ZAINO submitted to CDR an intentionally losing bid on behalf of Financial Institution A for the second investment agreement.  The bid form included false representations that the bid complied with applicable Treasury regulations and that defendant ZAINO did not consult with CDR or any other bidders about the bid; and

(x)    on or about June 28, 2002, via wire transfer, defendant ZAINO caused Financial Institution A to pay CDR a $10,000 kickback in the form of a hedge fee on behalf of Provider A.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 371.

## COUNT THREE - WIRE FRAUD
### (18 U.S.C. §§ 1343 and 2)

The United States of America further charges:

38.    MARK ZAINO is hereby made a defendant on the charge stated below.

39.    Paragraphs 2 through 4 and 9 through 17 of Count One and Paragraphs 26 through 28 of Count Two of this Information are repeated, realleged, and incorporated in

Count Three as if fully set forth in this Count.

## X. <u>DESCRIPTION OF THE OFFENSE</u>

40.     On or about the date indicated below, in the Southern District of New York and elsewhere, defendant ZAINO and other persons, known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud municipal issuers and to obtain money and property from these municipal issuers by means of false and fraudulent pretenses, representations, and promises, for purposes of executing such scheme, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures or sounds the following:

41.   On or about November 30, 2005, via interstate wire transfer from New York, New York to Kansas City, Missouri, Provider A made an artificially suppressed interest payment of approximately $482,108.82 to a state health and educational facilities authority pursuant to an investment agreement procured with the aid of defendant ZAINO who agreed on behalf of Financial Institution A to facilitate, and did facilitate Provider A's payment of a $475,000 kickback to CDR in exchange for obtaining the investment agreement.

IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTIONS 1343 AND 2

Dated:

_____
CHRISTINE A. VARNEY
Assistant Attorney General

_____
RALPH T. GIORDANO
Chief, New York Office

_____
SCOTT D. HAMMOND
Deputy Assistant Attorney General

_____
MARC SIEGEL
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

_____
REBECCA MEIKLEJOHN
STEVEN TUGANDER
KEVIN B. HART
MICHELLE O. RINDONE
Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 264-0654

_____
PREET BHARARA
United States Attorney
Southern District of New York

_____
NEVILLE S. HEDLEY
KALINA M. TULLEY
Attorneys, Antitrust Division
U.S. Department of Justice
209 South LaSalle Street, Suite 600
Chicago, IL 60604
(312) 353-7530

21